**FILED**

MAY 18 2023

UNITED STATES DISTRICT JUDGE
MARY M. ROWLAND

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

YALE SCHIFF

No. 19 CR 474-1

Judge Mary M. Rowland

## PLEA AGREEMENT

1.     This Plea Agreement between the Acting United States Attorney for the Northern District of Illinois, SONNY PASQUAL, and defendant YALE SCHIFF, and his attorney, THEODORE POULOS, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

## Charges in This Case

2.     The superseding indictment in this case charges defendant with bank fraud, in violation of Title 18, United States Code, Section 1344 (Counts Two, Three, Four, Six, Seven, Eight, Nine, Ten, Eleven, Twelve, Fourteen, and Fifteen) and aggravated identity theft, in violation of Title 18, United States Code, Section 1028A (Counts Thirteen and Sixteen).

3.     Defendant has read the charges against him contained in the superseding indictment, and those charges have been fully explained to him by his attorney.

4. Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charge to Which Defendant Is Pleading Guilty

5. By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following count of the superseding indictment: Count Two, which charges defendant with bank fraud, in violation of Title 18, United States Code, Section 1344. In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

## Factual Basis

6. Defendant will plead guilty because he is in fact guilty of the charge contained in Count One of the superseding indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt, constitute relevant conduct pursuant to Guideline § 1B1.3, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

Beginning in or around 2005 and continuing to in or around 2018, in the Northern District of Illinois, and elsewhere, defendant YALE SCHIFF knowingly participated in a scheme to defraud financial institutions and obtain money under the custody and control of those institutions by means of materially false and fraudulent pretenses, representations, and promises, and concealment of material facts.

2

More specifically, YALE SCHIFF, together with his co-defendant Jason Schiff, sought and obtained mortgage loans, vehicle loans, and lines of credit by making false statements regarding their employment, financial status, and encumbrances on collateral they pledged for loans. Further, YALE SCHIFF and Jason Schiff filed and caused the filing of false releases of mortgages and liens on real property and vehicles held as collateral for loans, thereby making it appear that the title to the collateral was free and clear and allowing Jason Schiff and YALE SCHIFF to fraudulently obtain additional loan proceeds or to sell the collateral and retain the sales proceeds, without payment to the prior lienholders.

As a part of the scheme, YALE SCHIFF and Jason Schiff fraudulently obtained a mortgage and home equity lines of credit ("HELOC") for a condominium located at 910 W. Madison Avenue, Unit 802, Chicago, Illinois. As a further part of the scheme, YALE SCHIFF fraudulently obtained or assisted in fraudulently obtaining mortgage loans and HELOCs for additional residences located in Chicago, Illinois, and fraudulently obtained at least fourteen separate vehicle loans.

*910 W. Madison*

In or around 2003, YALE SCHIFF obtained a HELOC from Bank One for 910 W. Madison Street, Unit 802, Chicago, Illinois ("Madison property"). In or around June 2005, YALE SCHIFF provided fictitious mortgage lien release documents to the Cook County Recorder of Deeds that falsely represented that Bank One had released its mortgage lien on the property, when he knew that he had an unpaid loan balance

3

and the lien had not been released. These misrepresentations caused the Recorder to remove Bank One's lien on the property.

In or around October 2005, YALE SCHIFF arranged to sell the Madison property to codefendant Jason Schiff, who obtained a loan in the amount of $375,200 from Chicago Bancorp to purchase the property. In connection with the closing for the sale of the Madison property, YALE SCHIFF signed a HUD-1 Settlement Statement that did not reflect the then-existing balance of the Bank One HELOC and falsely represented that the only mortgage on the property was an approximately $49,000 mortgage with First American Bank. At the closing for YALE SCHIFF's sale of the Madison property, YALE SCHIFF received approximately $340,728 in mortgage loan proceeds. Thereafter, beginning in or around October 2009 and continuing thereafter, Jason Schiff obtained additional loans from Fifth Third Bank in which he pledged the Madison property as collateral. These lenders funded the additional loans, in part, because YALE SCHIFF's fraudulent release of the Bank One lien and his selling of the Madison property to Jason Schiff concealed both his existing unpaid loan on the property and the fact that Bank One held the primary lien position on the property.

This conduct resulted in a loss of approximately $37,292 to Bank One, $536,774 to Fifth Third Bank, and $306,585 to CitiMortgage which acquired the loan from Chicago Bancorp. and Stewart Title Co., for a total loss of approximately $880,651.

4

*16 S. Aberdeen*

In or around July 2005, YALE SCHIFF obtained a HELOC in the amount of $125,000 from Chicago Bancorp for a condominium located at 16 S. Aberdeen Street, Unit 9, Chicago, Illinois ("Aberdeen property"). In obtaining the loan, YALE SCHIFF submitted false supporting income documents including fictitious Forms W-2. In or around August 2005, YALE SCHIFF provided fictitious mortgage lien release documents to the Cook County Recorder of Deeds that falsely represented that Chicago Bancorp had released its lien when at the time he knew he actually had an unpaid loan balance and the lien had not been released. His misrepresentations caused the Recorder to remove the lien on the property. After obtaining this fraudulent release, YALE SCHIFF continued to make regular payments on the Chicago Bancorp HELOC loan until approximately December 1, 2010.

Between approximately July 2005 and December 2005, YALE SCHIFF fraudulently obtained additional loans for the Aberdeen property from multiple lenders, by making false representations and filing false documents with the Cook County Recorder of Deeds, which resulted in the fraudulent release of these lenders' liens. More specifically, in or around July 2005, YALE SCHIFF obtained two loans for the property from Quicken Loans, one in the amount of $480,000 which was subsequently assigned to IndyMac Bank, and a second in the amount of $120,000 which was subsequently assigned to Bank of America. In obtaining the loans, YALE

SCHIFF submitted false supporting income documents including Forms W-2 and pay stubs. At the time of the closing, YALE SCHIFF received cash back of $93,303.23 from the loan proceeds.

In or around December 2005, YALE SCHIFF obtained a HELOC in the amount of $385,000 from BMO Harris Bank for the Aberdeen property. In applying for and obtaining this loan, YALE SCHIFF concealed the existence of the unpaid loan issued on this property by Quicken/IndyMac. From approximately January 2006 through August 2007, YALE SCHIFF received $383,000 in advances from the BMO Harris Bank HELOC. In or around April 2006, YALE SCHIFF provided fictitious mortgage lien release documents to the Cook County Recorder of Deeds, when at the time he knew he actually had an unpaid loan balance and the lien had not been released. After obtaining this fraudulent release, YALE SCHIFF continued to make payments on the BMO Harris Bank HELOC loan.

In or around May 2006, YALE SCHIFF obtained a $350,000 cash-out refinance loan from Chicago Financial Services, Inc., for the Aberdeen property. In applying for and obtaining this loan, YALE SCHIFF concealed the existence of the unpaid loans on this property including the Quicken/IndyMac loan and the BMO Harris Bank HELOC. At the time of the closing, YALE SCHIFF received $348,444.18 from the refinance loan proceeds. In or around September 2006, YALE SCHIFF provided fictitious mortgage lien release documents to the Cook County Recorder of

6

Deeds when at the time he knew he actually had an unpaid loan balance and the lien had not been released.

In or around December 2006, YALE SCHIFF obtained a HELOC in the amount of $468,000 from Washington Mutual Bank. In applying for and obtaining this loan, YALE SCHIFF concealed the existence of the unpaid loans on this property that were previously issued by Quicken/IndyMac and BMO Harris Bank. In support of his loan application, YALE SCHIFF also submitted false Forms W-2 for tax years 2004 and 2005. In or around November 2007, YALE SCHIFF provided fictitious mortgage lien release documents to the Cook County Recorder of Deeds purporting to release Washington Mutual Bank's lien on the property when at the time he knew he actually had an unpaid loan balance and the lien had not been released. After obtaining this fraudulent release, YALE SCHIFF continued to make payments on the Washington Mutual Bank HELOC loan.

In or around August 2008, YALE SCHIFF sold the Aberdeen Property to a third person for approximately $525,000, of which he retained approximately $484,000 in sales proceeds for his personal benefit. In order to purchase the Aberdeen property from YALE SCHIFF, the third person obtained a $417,000 mortgage loan from Busey Bank and was able to do so, in part, because the fraudulent releases of the various lenders' liens concealed the existence of the balances on YALE SCHIFF's outstanding mortgage loans and HELOCs.

7

His conduct resulted in Aberdeen property related loss of approximately $124,303 to GMAC, $79,000 to IndyMac/Bank of America, $384,384 to BMO Harris Bank, $350,000 to Chicago Financial Services/US Bank, $466,921 to Washington Mutual Bank, and $480,000 to Chicago Title and Trust Company, for a total loss of approximately $1,884,608.

*1000 W. Adams*

In or around September 2006, defendant YALE SCHIFF obtained a mortgage loan in the amount of $242,000 from Chicago Financial Services for a condominium located at 1000 W. Adams Street, Unit 816, Chicago, Illinois ("Adams property"). In or around November 2006, Chicago Financial Services assigned this mortgage loan to GMAC Bank, which was to be serviced by GMAC Mortgage. In or around December 2007, YALE SCHIFF caused the Cook County Recorder of Deeds to receive a document which reflected the release of the lien on the property. YALE SCHIFF continued to pay the monthly mortgage payment on this property until approximately December 1, 2010, despite the removal of Chicago Financial Services' lien on the property.

In or around April 2009, YALE SCHIFF transferred title to the Adams property which he held individually, to the 1000 W. Adams LLC, an entity for which he and "Individual A," were the sole members. 1000 W. Adams LLC paid no funds or consideration for this transfer. In or around November 2009, YALE SCHIFF caused the property to be conveyed for no consideration from the 1000 W. Adams LLC to

8

Individual A as sole owner. In or around November 2009, Individual A sought and obtained a mortgage from Wintrust Mortgage in the amount of $188,250, using the Adams property as collateral. In order to assist Individual A in obtaining the loan, YALE SCHIFF fraudulently concealed the existence of the outstanding debt he owed to GMAC on the property and falsely represented that the GMAC mortgage loan "has been paid in full and is now closed effective October 10, 2007." At the time YALE SCHIFF made these representations, he knew that the GMAC mortgage was not paid and that a balance remained. This misrepresentation was material to Wintrust in determining whether to approve the mortgage to Individual A. Based upon his false representations, Wintrust Mortgage approved the mortgage and disbursed loan proceeds to Individual A. This conduct resulted in a loss of approximately $242,000 to GMAC Bank.

Therefore, YALE SCHIFF's above-described real estate related frauds resulted in losses of approximately $3,007,630.

*Fraudulently Obtained Vehicle Loans and Fraudulently Sold Vehicles*

Between approximately 2008 and 2018, YALE SCHIFF and others fraudulently obtained more than $1.3 million in vehicle loans from lending and financial institutions through false statements in vehicle loan applications to obtain the vehicle loans and later by making false statements that resulted in the fraudulent removal of the lenders' liens from some of those vehicles' titles. YALE SCHIFF also

received sale proceeds from the sale of vehicles in which he fraudulently removed the existing lenders' liens. This conduct resulted in total losses of at least $726,191.

### Fraudulent Lines of Credit

Between approximately December 2014 and July 2018, YALE SCHIFF used the identity of another, fictitious identities of at least two individuals, and false employment and income information to obtain personal lines of credit in the names of these individuals at Navy Federal Credit Union and Pentagon Federal Credit Union, institutions insured by the National Credit Union Association; and BankFinancial N.A., an institution insured by the Federal Insurance Deposit Corporation. Thereafter, YALE SCHIFF obtained cash advances from the lines of credit which he used for his personal benefit and members of his family. This conduct resulted in line of credit related losses of approximately $66,073.

### Fraudulent Bank Accounts

Between approximately 2013 and 2015, YALE SCHIFF opened bank accounts at BMO Harris and First Merit Bank using a fictitious Social Security Number and a fictitious identity. His use of these accounts resulted in losses to these financial institutions of approximately $24,821.

### Fraudulent Credit Card Accounts

Between approximately February 2003 and July 2018, YALE SCHIFF and others used the identity of another, fictitious identities, and false employment and income information to open and use personal and business credit card accounts at

Pentagon Federal Credit Union, Digital Federal Credit Union, and Navy Federal Credit Union, institutions insured by the National Credit Union Association; and Citibank, Bank of America, Discover Bank, Comenity Bank, USAA Savings Bank, Barclays Bank of Delaware, Capital One Bank USA N.A., JP Morgan Chase Bank, and TD Bank, institutions insured by the Federal Deposit Insurance Corporation.

Thereafter, YALE SCHIFF used the credit cards to obtain cash advances, goods, and services, all for his personal benefit. This conduct by YALE SCHIFF resulted in losses totaling at least $90,398.50 to approximately 10 different financial institutions.

Therefore, YALE SCHIFF's charged and related conduct resulted in losses of at least $3,915,843.

## Maximum Statutory Penalties

7.    Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.    Count Two carries a maximum sentence of 30 years' imprisonment. Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation on this count. Count Two also carries a maximum fine of $1,000,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that with respect to Count Two the judge also may impose a term of supervised release of not more than five years.

11

b.     Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

c.     Pursuant to Title 18, United States Code, Section 3013, defendant will be assessed $100 on each count to which he has pled guilty, in addition to any other penalty or restitution imposed.

## Sentencing Guidelines Calculations

8.     Defendant understands that in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

9.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.    **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of the offense. The following statements regarding the calculation of the Sentencing Guidelines are based on the November 2021 Guidelines Manual.

b.    **Offense Level Calculations**.

i.    The base offense level is 7, pursuant to Guideline § 2B1.1(a)(1).

ii.    The base offense level is increased by 18 levels, pursuant to Guideline § 2B1.1(b)(1)(J), because the loss was more than $3,500,000 but less than $9,500,000.

iii.    The base offense level is increased by 2 levels, pursuant to Guideline § 2B1.1(b)(11)(C)(i) because it involved the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification.

iv.    The base offense level is increased by 2 levels, pursuant to Guideline § 2B1.1(b)(17)(A), because defendant received more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense.

v.    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of

13

Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

      vi.      In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

      c.      **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

      d.      **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level, 26, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 63 to 78 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

e.     Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

10.     Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

### Agreements Relating to Sentencing

11.     Each party is free to recommend whatever sentence it deems appropriate.

12.     It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

13.     Regarding restitution, defendant acknowledges that the total amount of restitution owed to the victims is $2,955,954, minus any funds repaid prior to sentencing, and that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant, together with any jointly liable co-defendant, to make full restitution in the amount outstanding at the time of sentencing.

14.     Restitution shall be due immediately and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), he is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

15.     Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

16.     Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

17.     After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the superseding indictment, as well as the indictment as to defendant.

### Forfeiture

18.     Defendant understands that by pleading guilty, he will subject to forfeiture to the United States all right, title, and interest that he has in any property constituting or derived from proceeds obtained, directly or indirectly, as a result of the offense.

19.     Defendant agrees to the entry of a personal money judgment in the amount of $2,955,954, which represents the total amount of funds involved in the offense. Defendant consents to the immediate entry of a preliminary order of forfeiture setting forth the amount of the personal money judgment he will be ordered to pay.

20.     Defendant admits that because the directly forfeitable property is no longer available for forfeiture as described in Title 21, United States Code, Section 853(p)(1), the United States is entitled to seek forfeiture of any other property of

defendant, up to the value of the personal money judgment, as substitute assets pursuant to Title 21, United States Code, Section 853(p)(2).

21. Defendant understands that forfeiture shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment. In this case, however, the United States Attorney's Office will recommend to the Attorney General that any net proceeds derived from any forfeited assets be remitted or restored to eligible victims of the offense pursuant to Title 18, United States Code, Section 981(e), Title 28, Code of Federal Regulations, Part 9, and other applicable law.

22. Defendant agrees to waive all constitutional, statutory, and equitable challenges in any manner, including but not limited to direct appeal or a motion brought under Title 28, United States Code, Section 2255, to any forfeiture carried out in accordance with this agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

23. This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 19 CR 474-1.

18

24. This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

25. Defendant understands that nothing in this Agreement shall limit the Internal Revenue Service in its collection of any taxes, interest or penalties from defendant or defendant's partnership or corporations.

### Waiver of Rights

26. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

    a. **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

        i. The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.     If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.     If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the superseding indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

20

vi.     At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.     At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

b.     **Appellate rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial and may only appeal the validity of this plea of guilty and the sentence imposed. Defendant understands that any appeal must be filed within 14 calendar days of the entry of the judgment of conviction.

27.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

## Presentence Investigation Report/Post-Sentence Supervision

28.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the

nature, scope, and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing.

29.    Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

30.    For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of

defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

31.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

32.     Defendant understands that pursuant to Title 12, United States Code, Sections 1785(d) and 1829, his conviction in this case will prohibit him from directly or indirectly participating in the affairs of any financial institution insured by the National Credit Union Share Insurance Fund or the Federal Deposit Insurance Corporation, except with the prior written consent of the National Credit Union Administration Board or the FDIC and, during the ten years following his conviction, the additional approval of this Court. Defendant further understands that if he knowingly violates this prohibition, he may be punished by imprisonment for up to five years, and a fine of up to $1,000,000 for each day the prohibition is violated.

33.     Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

## Conclusion

34.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

35.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

36.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

24

37.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

38.     Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.


AGREED THIS DATE: _May 11, 2023_

MICHELLE PETERSEN
Digitally signed by MICHELLE PETERSEN
Date: 2023.05.09 15:08:13 -05'00'                    for MP
_____
SONNY PASQUAL
Acting United States Attorney

_____
YALE SCHIFF
Defendant

_____
PATRICK J. KING, JR.
Assistant U.S. Attorney

_____
THEODORE POULOS
Attorney for Defendant