```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3    UNITED STATES OF AMERICA,        )  Docket No. 19 CR 474-1
                                       )
 4                   Plaintiff,        )  Chicago, Illinois
                                       )  May 18, 2023
 5              v.                     )  10:58 a.m.
                                       )
 6    YALE SCHIFF,                     )
                                       )
 7                   Defendant.        )

 8
              TRANSCRIPT OF PROCEEDINGS - Change of Plea
 9            BEFORE THE HONORABLE MARY M. ROWLAND

10    APPEARANCES:

11
      For the Government:   MR. PATRICK J. KING JR.
12                          Assistant United States Attorney
                            Honorable Morris O. Pasqual
13                          Acting United States Attorney
                            219 S. Dearborn Street, 5th Floor
14                          Chicago, IL 60604

15
      For the Defendant:    MR. THEODORE T. POULOS
16                          Cotsirilos Tighe Streicker
                              Poulos & Campbell Ltd.
17                          33 N. Dearborn Street, Suite 600
                            Chicago, IL 60602
18
                            MR. ADAM J. SHEPPARD
19                          Sheppard Law Firm PC
                            180 N. LaSalle Street, Suite 2510
20                          Chicago, IL 60601

21
      Also Present:         MR. YALE SCHIFF
22

23    Court Reporter:       LAURA R. RENKE, CSR, RDR, CRR
                            Official Court Reporter
24                          219 S. Dearborn Street, Room 1224
                            Chicago, IL 60604
25                          312.435.6053
                            laura_renke@ilnd.uscourts.gov
```

1          (In open court; defendant present.)

2               THE CLERK:  This court resumes in session.

3               19 CR 474, United States of America v. Yale Schiff.

4               THE COURT:  Okay.  Good morning.  Can we get

5     appearances on the record.  We'll start with the government.

6               MR. KING:  Good morning, your Honor.  Patrick King

7     appearing on behalf of the United States.

8               MR. SHEPPARD:  Good morning, your Honor.

9               MR. POULOS:  Go ahead.

10              MR. SHEPPARD:  Adam Sheppard, one of Mr. Schiff's

11    lawyers, on behalf of Yale Schiff, along with co-counsel.

12              MR. POULOS:  Good morning, your Honor.  Ted Poulos.

13              And obviously Mr. Schiff is present before the Court.

14              THE COURT:  Good morning.

15              THE DEFENDANT:  Good morning, your Honor.

16              THE COURT:  Okay, Mr. Schiff.  So you've had a break

17    to talk to your family.  And I understand you're still -- are

18    back here to enter a plea of guilty today.

19              THE DEFENDANT:  Yes, your Honor.

20              THE COURT:  Okay.

21              THE DEFENDANT:  Thank you for your patience.

22              THE COURT:  No problem.  It's a difficult decision.

23    Difficult day for you, I know.

24              So in order to accept a plea, I have to make several

25    findings.  Okay?  I have to determine that you're competent --

1    so that you understand what's happening today in court -- that

2    you've had the assistance of a lawyer, that you understand your

3    trial rights -- the rights that you're giving up to go to

4    trial -- you understand the nature of the charges -- so you

5    know what you're pleading guilty to -- that the plea is

6    voluntary -- so no one's threatening you, paying you a lot of

7    money, threatening your family to get you to plead guilty --

8    and that there's a factual basis.  That means you actually did

9    something that's a crime.  Okay?

10          The way that I make those determinations is I put you

11    under oath and I ask you a series of questions.  Like

12    20 minutes we're going to be here, and I'm going to be asking

13    you questions.

14          There's two things about being under oath.  The first

15    is that if you lie when you're under oath, that's a crime.  So

16    you don't want to do that.  If you don't understand a question,

17    just give me a timeout and we'll take a break.  You can talk to

18    your lawyers.

19          The second is you always have a right to remain

20    silent.  You've heard that on TV.  But you're giving that right

21    up today because you're going to answer my questions, and some

22    of the questions I ask you are going to be incriminating.  So

23    you're giving up your Fifth Amendment right to remain silent.

24          Do you understand that?

25          THE DEFENDANT:  I do, your Honor.

```
1              THE COURT:  Okay.  Raise your right hand.

2              MR. POULOS:  Speak up.

3         (Defendant duly sworn.)

4              THE DEFENDANT:  I do.

5              THE COURT:  Okay.  All right.

6              Can you tell me your full name.

7              THE DEFENDANT:  Yale Mark Schiff.

8              THE COURT:  Okay.  Spell your last name.

9              THE DEFENDANT:  S-C-H-I-F-F.

10             THE COURT:  How old are you?

11             THE DEFENDANT:  48.

12             THE COURT:  Okay.  Are you married?

13             THE DEFENDANT:  Yes.

14             THE COURT:  Do you have children?

15             THE DEFENDANT:  Yes, three.

16             THE COURT:  Three.  How old are they?

17             THE DEFENDANT:  Twin 9-year-olds and a 12-year-old.

18             THE COURT:  Okay.  29 and 12?

19             THE DEFENDANT:  No.  Twin 9-year-olds and a

20        12-year-old.

21             THE COURT:  Okay.  All right.  Oh, you're busy.

22             THE DEFENDANT:  Yes.

23             THE COURT:  Okay.  How far did you go in school?

24             THE DEFENDANT:  I'm sorry?

25             THE COURT:  How far did you go in school?
```

1          THE DEFENDANT:  I have some college.

2          THE COURT:  Some college.  Okay.

3          What type of work have you done in the past three

4    years?

5          THE DEFENDANT:  Internet sales.

6          THE COURT:  Sales.  Okay.

7          Are you under the care of a doctor for any physical

8    problems?

9          THE DEFENDANT:  Yes.

10         THE COURT:  Okay.  Do you take medication for those

11   ailments?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Okay.  Can you tell me a little bit about

14   either the ailments or what medication you take.

15         THE DEFENDANT:  Sure.  I'm under doctor for -- several

16   doctors for several different reasons.  I have psoriatic -- I

17   have psoriasis, so I'm treated regularly for that with a

18   medication called Skyrizi.

19         I treated for depression and anxiety.

20         THE COURT:  Okay.

21         THE DEFENDANT:  And I take several medications for

22   that.  I wrote a list if you'd like to --

23         THE COURT:  You wrote down a list?

24         THE DEFENDANT:  Yeah, of the medication.

25         THE COURT:  That's perfect.

1          THE DEFENDANT:  Excuse me.  I take something called

2    desvenlafaxine, 50 milligrams once a day, for depression.

3          I take --

4          COURT REPORTER:  Would you say that again for me,

5    please.

6          THE DEFENDANT:  Yeah.  I can spell it.

7          MR. POULOS:  Spell  it.

8          THE DEFENDANT:  D-E-S-V-E-N-L-A-F-A-X-I-N-E.  That's

9    50 milligrams once a day.

10         I take doxepin, 10 milligrams a day at bedtime, as

11   needed for sleep.

12         I take lorazepam, 1 milligram up to twice a day, for

13   anxiety.

14         I take alorazepam, also for anxiety, up to three times

15   a day.  It's as needed.

16         Ambien CR, 12.5 at bedtime, for sleep.

17         And I take Adderall, 20 milligrams three times a day.

18         THE COURT:  Okay.  So for the physical, you have

19   psoriasis.  Anything else for physical?

20         THE DEFENDANT:  I have back issues.

21         THE COURT:  Okay.

22         THE DEFENDANT:  I have a couple of ruptured discs.

23   And I'm currently -- I'm sorry?

24         THE COURT:  Do you take any pain medication for

25   your --

1          THE DEFENDANT:  Just ibuprofens as needed.

2          THE COURT:  Okay.

3          THE DEFENDANT:  Prescription ibuprofens, but ibuprofen

4    nonetheless, just a stronger dose.

5          THE COURT:  Okay.

6          THE DEFENDANT:  And I'm currently being treated for

7    some symptoms related to long COVID.

8          THE COURT:  Okay.

9          THE DEFENDANT:  I was hospitalized with COVID for

10   about a week --

11         THE COURT:  Okay.

12         THE DEFENDANT:  -- about a year and a half ago.  I

13   still have chronic cough from that.

14         THE COURT:  Okay.  Are you on any medication for the

15   long COVID?

16         THE DEFENDANT:  Yeah.  I didn't write those down.  I

17   think it's -- I can look it up on my phone if you want.  Is

18   that okay?

19         THE COURT:  Sure.

20         THE DEFENDANT:  I'm sorry.

21         THE COURT:  No, that's okay.  You're being very

22   thorough.

23         Mr. King, if you want to listen through headphones,

24   they're very helpful.

25         THE DEFENDANT:  I've just got to look at the Walgreens

1    app.  It will tell me.

2              THE COURT:  You'll probably have to sit at the table.

3              MR. KING:  Thank you, your Honor.

4              THE DEFENDANT:  It is montelukast, 10 milligrams.

5              MR. POULOS:  Why don't you spell that.

6              THE DEFENDANT:  That's M-O-N-T-E-L-U-K-A-S-T.  That's

7    10 milligrams once a day.

8              And loratadine, which is like -- I forgot the store

9    name -- like Claritin, 10 milligrams once a day --

10             THE COURT:  Okay.

11             THE DEFENDANT:  -- as well.  That's to help with the

12   cough.

13             THE COURT:  Okay.

14             THE DEFENDANT:  And I'm undergoing, you know,

15   treatment to find out exactly what's causing it.  I just had a

16   chest ultrasound yesterday --

17             MR. POULOS:  CAT scan.

18             THE DEFENDANT:  I'm sorry.  CAT scan.  I apologize.

19             (Continuing) -- yesterday to find out --

20             MR. POULOS:  Tuesday.

21             THE DEFENDANT:  Yesterday.

22             MR. POULOS:  Today is Thursday.

23             THE DEFENDANT:  Oh, today is Thursday.  I'm sorry.

24             (Continuing) -- on Tuesday --

25             THE COURT:  Okay.

1    THE DEFENDANT:  -- to see what's going on with that.

2  I don't have the results yet.

3    And the other issue I'm being treated for, which is

4  ongoing testing as well that started last year, is memory loss.

5  So far I've had cognitive testing at the neurologist.  I have

6  an upcoming MRI, brain MRI, in a couple of weeks.

7    And then I have -- I believe it's on December 2nd I

8  have a whole cognitive panel testing at Northwestern.

9  Unfortunately, that's the soonest appointment available.  I've

10  had the appointment for months.  There's one doctor who does

11  this.

12    And that's what I'm currently being treated for.

13    THE COURT:  Okay.  All right.

14    So physical, we have the back pain, the psoriasis, and

15  the long COVID.

16    THE DEFENDANT:  Yes.

17    THE COURT:  Okay.  Then you have -- that's it

18  physical.

19    THE DEFENDANT:  Physical, yes.

20    THE COURT:  Okay.  Then we have some mental health

21  issues, which are depression and anxiety, and you've told me

22  the medication you're taking for those.

23    THE DEFENDANT:  Yes.

24    THE COURT:  And you also have some sleep issues --

25    THE DEFENDANT:  Correct.

1          THE COURT:  -- which may be due to depression and

2    anxiety.

3          THE DEFENDANT:  Or anxiety, yes.

4          THE COURT:  Okay.

5          THE DEFENDANT:  Memory loss is more of a physical

6    issue.  It's not --

7          THE COURT:  That's true.

8          THE DEFENDANT:  It's not really a mental issue.  They

9    don't know what's causing it, you know, but I've had several --

10   I've had numerous concussions over the years.  I've been --

11   I've had a motorcycle wreck.  I had a very horrible car

12   accident where the car flipped seven times.  And so I've had

13   numerous head traumas over the years.

14         THE COURT:  Okay.

15         THE DEFENDANT:  So that could be -- but we won't know

16   until, you know, more testing is done.  But that's what's

17   happening right now.

18         THE COURT:  Okay.  And so you've had some concussions.

19         So some of the medication must make you drowsy.

20         THE DEFENDANT:  Some of it, yes, but mainly that's at

21   night.

22         THE COURT:  Uh-huh.  Well, that's the point of the

23   medication.

24         So as you stand here today, can you understand the

25   questions I'm asking you?

1         THE DEFENDANT:  Yes, I can.

2         THE COURT:  Okay.  And as you've been represented by

3  your lawyers for several months, longer maybe, have you been

4  able to communicate with them about the case?

5         THE DEFENDANT:  Yes, I have.

6         THE COURT:  Okay.  And can you understand what they're

7  telling you when they're going over the evidence in the case?

8         THE DEFENDANT:  Yes, I can, your Honor.

9         THE COURT:  Okay.  And you understand the charges, the

10  type of charges that there are?

11         THE DEFENDANT:  I do, your Honor.

12         THE COURT:  Okay.  So you've represented Mr. Schiff

13  for quite a while here.  I don't know, Mr. Sheppard,

14  Mr. Poulos, who I'm talking to, who's met with him more.

15         But any concern about competence?

16         MR. SHEPPARD:  No, your Honor.

17         MR. POULOS:  Your Honor, I will -- I will say that

18  over the last few months, I've had many conversations with

19  Mr. Schiff about -- about detailed issues relating to this

20  case, involving some matters of complexity and applying the

21  facts to the law.  And throughout that period of time, I've

22  been very impressed with Mr. Schiff's ability to understand and

23  appreciate those concepts and issues.

24         And so I will state that I have absolutely no doubt

25  about his mental competency for what we're doing today.

1          THE COURT:  Okay.  But he's just told me that he has

2  memory loss and he is being tested for memory loss, and he's

3  going to Northwestern in the fall for a panoply of tests.

4          Are you concerned at all about that?

5          MR. POULOS:  Your Honor, not as it relates to the

6  facts of this case.

7          THE COURT:  Okay.

8          Mr. King, I saw you furiously taking notes and trying

9  to make sure you could hear what was being reported, so maybe

10  some of this is news to you.

11          Do you have any concern about Mr. Schiff's competence

12  to enter a plea today?

13          MR. KING:  I do not, your Honor.

14          And as to the memory loss, I was personally present

15  for two proffer sessions with the defendant.  I don't have any

16  belief of any -- I don't have any personal experience where I

17  believe he would have memory loss or any cognitive issue that

18  would have -- would impair his ability, although it was

19  probably a year ago.

20          THE COURT:  Okay.  Okay.

21          Mr. Schiff, do you feel ready to proceed?

22          THE DEFENDANT:  I do, your Honor.

23          THE COURT:  Okay.  I appreciate your honesty, and I

24  appreciate your being so prepared today.  Okay?

25          THE DEFENDANT:  Thank you.

1      THE COURT:  All right.  I'm going to find that you're

2  competent to enter a plea today.

3      Okay.  Now, I want to make sure you understand the

4  charges.  Okay?  Some people are charged with selling drugs;

5  some are charged with bank robbery; some are charged with

6  fraud, different kinds of charges.

7      THE DEFENDANT:  Sure.

8      THE COURT:  I'm going to ask either one of your

9  lawyers to tell me, without talking about any of your

10  conversations, obviously, how they described the charges,

11  specifically the ones that you're going to plead guilty to --

12  which, as I understand it, is Count II in the indictment, which

13  is bank fraud -- so what the government has to prove to

14  establish that you committed bank fraud into simple terms so

15  that Mr. Schiff can understand "bank fraud."

16      MR. POULOS:  Your Honor, we explained that in order to

17  commit the offense of bank fraud, Mr. Schiff must have made

18  materially false and fraudulent pretenses, representations,

19  promises to an FDIC-insured institution for the purpose of

20  causing the bank to issue funds and that the conduct as charged

21  herein, false -- alleged false representations or omissions

22  with respect to failure to disclose the improper fraudulent

23  removal of prior liens that were existing on certain properties

24  that the banks lent money against so that prior mortgages

25  were -- were concealed and not noted by the victim lending

1    institution in this case.

2              THE COURT:  Okay.  So, Mr. Schiff, you understand the

3    nature of a bank fraud?

4              THE DEFENDANT:  I do, your Honor.

5              THE COURT:  Okay.  So you're lying to the bank.  The

6    bank is federally insured.  And because of those lies, the bank

7    relies on that and then loans out money.

8              You understand that?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  Okay.  Now, you have two attorneys here,

11   so you're doubly protected.  And I want to know, have you had

12   enough time to meet with them and discuss the charges in the

13   case?

14             THE DEFENDANT:  I have, your Honor.

15             THE COURT:  Okay.  Have you discussed with them all

16   the evidence that the government has presented in the case?

17             THE DEFENDANT:  Yes, your Honor.

18             THE COURT:  Have they answered all your questions in

19   the case?

20             THE DEFENDANT:  Yes, your Honor.

21             THE COURT:  Have you told them everything you know

22   about the case?

23             THE DEFENDANT:  Yes, your Honor.

24             THE COURT:  Are you satisfied with their efforts on

25   your behalf?

1           THE DEFENDANT:  I am, your Honor.

2           THE COURT:  Okay.  You're entering into a plea

3   agreement.  I have a signed copy of it here.

4           And this is your signature here on the back --

5           THE DEFENDANT:  Yes, your Honor.

6           THE COURT:  -- page.

7           Okay.  Have they answered all your questions about the

8   plea agreement?

9           THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  Okay.  And have they reviewed every aspect

11  of this plea agreement?  It's 25 pages.  Have they reviewed

12  every paragraph --

13          THE DEFENDANT:  Yes, your Honor.

14          THE COURT:  -- of the plea agreement with you?

15          THE DEFENDANT:  Yes, we have.

16          THE COURT:  Okay.  And they've answered all your

17  questions?

18          THE DEFENDANT:  Excuse me.  Yes.

19          THE COURT:  Okay.  Now, the plea.

20          Is the plea completely voluntary?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Has anyone threatened you in any way to

23  get you to enter the plea?

24          THE DEFENDANT:  No, your Honor.

25          THE COURT:  Has anyone threatened anyone in your

1    family?

2              THE DEFENDANT:  No, your Honor.

3              THE COURT:  Has anyone made any promises to you to get

4    you to enter the plea?

5              THE DEFENDANT:  No, your Honor.

6              THE COURT:  Okay.  Has either of your lawyers said,

7    "Oh, if you enter this plea, there's this guaranteed outcome"?

8              THE DEFENDANT:  No, your Honor, they have not.

9              THE COURT:  Okay.  All right.

10             So your decision to plead guilty here today is

11   completely free and voluntary?

12             THE DEFENDANT:  Yes, your Honor.

13             THE COURT:  Okay.  All right.

14             Now, most people when they decide whether to go to

15   trial or to plead guilty, their biggest concern is potential

16   sentencing consequences.  And that makes sense.  So I'm going

17   to review the sentencing consequences in pretty great detail.

18   And I want you to let me know if you have any questions.  Okay?

19             THE DEFENDANT:  Of course, your Honor.

20             THE COURT:  So I understand you're pleading guilty to

21   Count II.  And in exchange, the government at the sentencing

22   will dismiss the remaining counts that you're charged in.

23             Count II carries a maximum of 30 years in prison.

24             Do you understand that?

25             THE DEFENDANT:  I do, your Honor.

1          THE COURT:  Okay.  You cannot receive probation on a

2   bank fraud.

3          Do you understand that?

4          THE DEFENDANT:  I do, your Honor.

5          THE COURT:  Okay.  You can face a maximum fine of a

6   million dollars, or two times the gross loss in terms of a

7   fine.

8          Do you understand that?

9          THE DEFENDANT:  Yes, your Honor.

10         THE COURT:  Okay.  I don't have to impose a fine, but

11  that's the maximum fine that I can impose.

12         THE DEFENDANT:  I understand.

13         THE COURT:  Okay.  You will get, after a term of

14  imprisonment, supervised release, and that cannot be more than

15  five years.

16         Do you understand that?

17         THE DEFENDANT:  Yes, your Honor.

18         THE COURT:  Okay.  An amount of restitution is

19  mandatory.  That means I don't have any choice in the matter.

20  And the restitution, I believe, in this case is agreed.  So I'm

21  going to tell you what that amount is.

22         Do you understand that?

23         THE DEFENDANT:  Yes, your Honor.

24         THE COURT:  I also have to impose in every case a

25  $100 special assessment.

1          Do you understand that?

2          THE DEFENDANT:  Of course.

3          THE COURT:  The amount of restitution agreed here is

4    $2,955,954.

5          Do you understand that?

6          THE DEFENDANT:  I do, your Honor.

7          THE COURT:  Okay.  Now, that, of course -- we'll

8    subtract from that any money that's repaid between today and

9    the day of sentencing, of course.

10          You understand that?

11          THE DEFENDANT:  Of course.

12          THE COURT:  And that will be several -- owed severally

13    and jointly with the codefendant.  That's how the sentencing

14    order will read.

15          Do I understand that correctly, Mr. Poulos?

16          MR. POULOS:  Yes, to the extent that there --

17          THE COURT:  Is a conviction.

18          MR. POULOS:  -- is a conviction and an order of

19    restitution as to his codefendant brother.

20          THE COURT:  Okay.  So your order will read that

21    amount, but there may be another pot of money from which that

22    amount will be paid.

23          You understand that?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Okay.

1          THE DEFENDANT:  Excuse me.

2          THE COURT:  The way that we enter that is that it's

3  due immediately.  And then it's paid pursuant to a schedule

4  that's entered.

5          Do you understand that?

6          THE DEFENDANT:  I do, your Honor.

7          THE COURT:  Okay.  Now, another -- so that's the

8  statute of bank fraud, and that stands on its own.

9          There's another sentencing statute that tells me I'm

10 to take into account you, your background, who you are, other

11 things about you -- your health, your education -- the

12 community, protecting the community, promoting respect for the

13 law, trying to make sure that people who commit this crime are

14 not treated in a disparate fashion, that they're all treated

15 similarly.

16         And one of the ways that Congress wants us to achieve

17 that goal is to look at the sentencing guidelines.  I'm

18 guessing you've reviewed these with your --

19         THE DEFENDANT:  Yes, your Honor.

20         THE COURT:  -- lawyers.  Okay.

21         So under this chart, you end up -- taking into account

22 various factors, you end up at a Level 26.

23         Does that sound familiar?

24         THE DEFENDANT:  Yes, your Honor.

25         THE COURT:  And you're at a Criminal History

1  Category I.  You don't have any criminal history.  And so that

2  results in a guideline range of 63 to 78 months in prison.  So

3  that's a little better than five years.

4          Do you understand that?

5          THE DEFENDANT:  I do, your Honor.

6          THE COURT:  Okay.  Now, what's important for today is

7  that guideline range is not binding on me.

8          Do you understand that?

9          THE DEFENDANT:  I do, your Honor.

10         THE COURT:  Okay.  So I could sentence you above that

11  guideline range, and it's -- that's not a basis for you to look

12  at your lawyer and say, "Wait a minute.  She's going above the

13  guideline range.  I want to go to trial."

14         Do you understand that?

15         THE DEFENDANT:  Yes.

16         THE COURT:  Okay.  And probation is going to do this

17  report about you and about the guidelines, and they're going to

18  look at all sorts of things.  And they might recommend the

19  higher guideline range.  And if they do, your lawyers will have

20  a lot to say about that.

21         But in the end, if they recommend a higher guideline

22  range, that's not a basis for you to say, "Wait.  I want to go

23  to trial."

24         Do you understand that?

25         THE DEFENDANT:  I do.

1       THE COURT:  Okay.  So for now, what you need to know

2  is you're entering a plea of guilt voluntarily, and it doesn't

3  depend on you getting a certain guideline range.

4       THE DEFENDANT:  I understand that.

5       THE COURT:  Okay.  Finally with respect to

6  consequences of the plea is you're entering into a forfeiture

7  agreement.  And that's going to happen fairly soon, I'm

8  guessing, with Mr. King.  And it will be -- it's going to be

9  independent of the sentencing, I think.  And you'll send me up

10  a personal money judgment that I'll enter.  And it's going to

11  be a preliminary order of forfeiture.  And it will be a money

12  judgment.

13       Are you going to do that at the sentencing?

14       MR. KING:  I will do that, your Honor --

15       COURT REPORTER:  I can't hear you.  Can you turn the

16  microphone.  There's a microphone at the table.

17       MR. KING:  Yes, your Honor, I will do that.

18       The forfeiture as set forth in the superseding

19  indictment also listed a parcel of real estate.  The defendant

20  is not on the title to that real estate.  And I've made clear

21  to counsel that we're going to release the lien that is on that

22  parcel of real estate.  That is just a money judgment.  We're

23  not going to seek to enter a preliminary order of forfeiture as

24  to that real estate.

25       THE COURT:  Okay.  So the government will send up a

1  preliminary order of forfeiture.  It's going to have a money

2  amount in it.

3           MR. KING:  Yes, your Honor.

4           THE COURT:  It will be a judgment, and I will enter

5  that in fairly short order.

6           Do you understand that?

7           THE DEFENDANT:  I do, your Honor.

8           THE COURT:  Okay.  So that's another consequence of

9  today's plea.

10          Do you understand that?

11          THE DEFENDANT:  I do, your Honor.

12          THE COURT:  Okay.  All right.

13          And, finally, nothing -- two more things.  Nothing

14  about this plea binds the IRS.  So just because Mr. King works

15  for the United States government, he doesn't bind the IRS.

16  They're their own thing.  So that doesn't mean they'll take any

17  action.  But it can't -- we can't prevent them from taking

18  action.

19          Do you understand that?

20          THE DEFENDANT:  Yes, your Honor.  I apologize.

21          THE COURT:  And, finally, you are forevermore

22  prohibited from participating in either an FDIC bank or a bank

23  protected by the National Credit Union Share Insurance Fund

24  unless you get prior written permission.

25          Do you understand that?

1            THE DEFENDANT:  I think so.

2            Does that mean I can't open a bank account?

3            MR. SHEPPARD:  No.

4            THE DEFENDANT:  I just can't work for --

5            THE COURT:  It just means you can't work for an FDIC

6 bank or you can't work for a credit union.

7            THE DEFENDANT:  I can't work for a bank.  I just

8 wanted to clarify.  Sorry.

9            THE COURT:  No, we want you to work and have a bank

10 account.

11            THE DEFENDANT:  No, no, of course.  I just -- I

12 didn't --

13            THE COURT:  That's how they're going to collect their

14 restitution.

15            Okay.  That's it for me in terms of consequences and

16 sentencing.  Have I missed anything, Mr. Poulos?

17            THE DEFENDANT:  Can I speak with my attorney for one

18 second?

19            THE COURT:  Yes.

20       (Counsel and defendant conferring.)

21            THE DEFENDANT:  Sorry, your Honor.

22            THE COURT:  That's okay.

23            Are you okay?

24            MR. POULOS:  Your Honor, I believe the Court has

25 covered all of the issues relating to the consequences of the

1    plea.

2              THE COURT:  Okay.  Mr. King, anything I need to cover

3    in terms of sentencing or consequences?

4              MR. KING:  No, your Honor.

5              THE COURT:  Okay.  All right.

6              Now, Mr. Schiff, of course, if you didn't want to

7    enter a plea of guilty, you would go to trial.  And you know

8    there's a trial set.  So let me just run over your trial rights

9    so you know you're waiving them today.

10             You have a right to continue to plead not guilty and

11   go to trial.

12             Do you know that?

13             THE DEFENDANT:  I do, your Honor.

14             THE COURT:  And the trial would be in front of a jury.

15             Do you understand that?

16             THE DEFENDANT:  I do, your Honor.

17             THE COURT:  At trial you'd be presumed innocent, and

18   the government would have the burden of proving you guilty

19   beyond a reasonable doubt.

20             Do you understand that?

21             THE DEFENDANT:  I do.

22             THE COURT:  Okay.  You'd have the right to an

23   assistance of counsel at trial and all the way leading up to

24   trial.  I know you have retained counsel, but if you weren't

25   able to afford counsel, I would appoint one to represent you.

1        Do you understand that?

2        THE DEFENDANT:  I do, your Honor.

3        THE COURT:  You have a right to see and hear all the

4   government's witnesses and evidence and to confront those

5   witnesses.  That means to cross-examine those witnesses.

6        Do you understand that?

7        THE DEFENDANT:  I do, your Honor.

8        THE COURT:  You also have the right to present

9   evidence.  That means sometimes using the Court's subpoena

10  power.  So if you need documents, your lawyer could use the

11  Court's subpoena power to get those documents.  And if you need

12  a witness to come into court who isn't willing to come in, your

13  lawyers could subpoena that witness and require them to appear

14  on your behalf.

15       Do you understand that?

16       THE DEFENDANT:  I do, your Honor.

17       THE COURT:  One person can't be forced to testify.

18  That's Yale Schiff.  So the government cannot put you on the

19  witness stand.

20       Do you understand that?

21       THE DEFENDANT:  I do, your Honor.

22       THE COURT:  If you don't testify, the jury is

23  specifically told that they can't assume or presume anything

24  about that or assume your guilt because of that, because you

25  have a right to remain silent.

1    You understand that?

2    THE DEFENDANT:  I -- I do, your Honor.

3    THE COURT:  You also have a right to testify

4    regardless of what your lawyers advise.  So you talk to them,

5    you talk to me, and you make that decision.

6    Do you understand that?

7    THE DEFENDANT:  I do.

8    THE COURT:  The jury is composed of 12 people.  And

9    it's selected by a process where we ask them a bunch of

10   questions, and you and your lawyers help pick the jury in two

11   ways.

12   First, if any of the members of the venire indicate

13   that they can't be fair -- maybe because it's a fraud case,

14   maybe because they had their identity stolen, something like

15   that -- then your lawyers argue to me that, you know, they

16   can't be fair; they should be excused for cause.  That's a

17   for-cause challenge.

18   The second way is called a peremptory challenge where

19   you and your lawyers, you have whatever strategy you have, and

20   you excuse certain jurors and you don't have to explain why.

21   You just let those jurors go.

22   And in those two ways, you help pick the people who

23   serve on your jury.

24   Do you understand that?

25   THE DEFENDANT:  I do, your Honor.

1       THE COURT:  Once the jury is selected and they've

2   heard the evidence and they've heard the arguments, then they

3   go back to the jury room to reach a verdict.  That verdict must

4   be unanimous.

5       Do you understand that?

6       THE DEFENDANT:  I do, your Honor.

7       THE COURT:  If there are multiple counts, which there

8   are here, and/or multiple defendants, which there are here, the

9   jury is required to consider each count separately and

10  certainly consider the defendants separately.  And there are

11  instructions regarding that.  So they can reach different

12  verdicts as to the different defendants.

13      Do you understand that?

14      THE DEFENDANT:  I do.

15      THE COURT:  Last, if we went to trial, of course,

16  there would -- you would be able to appeal decisions that I

17  might make leading up to the trial, decisions I would make

18  during the trial, certain things that the government might do

19  leading up to the trial or during the trial.

20      But because you're waiving your right to trial, you're

21  waiving those rights to appeal.

22      Do you understand that?

23      THE DEFENDANT:  I do, your Honor.

24      THE COURT:  Okay.  Is he giving up any other appellate

25  rights?

1       MR. KING:  No, your Honor.

2       THE COURT:  He can appeal his sentence --

3       MR. KING:  No.

4       THE COURT:  -- and his conviction.

5       Okay.  So having heard all those rights, do you want

6  to proceed to plead guilty?

7       THE DEFENDANT:  Yes, your Honor, I do.

8       THE COURT:  All right.  So the final thing we have to

9  do is make sure that there's a factual basis.  That means that

10 you committed conduct that the government can prove beyond a

11 reasonable doubt that proves the elements of a bank fraud.

12      So I'm going to ask Mr. King to tell me what the

13 government can prove beyond a reasonable doubt, and then I'm

14 going to ask you if what he tells me is true.  Okay?

15      THE DEFENDANT:  Okay, your Honor.

16      MR. KING:  Your Honor, if this matter proceeded to

17 trial, the government would offer evidence and call witnesses

18 to establish that beginning no later than 2005 and continuing

19 to approximately 2018, the defendant participated in a scheme

20 to defraud financial institutions to obtain money under their

21 custody, control by means of false and fraudulent

22 representations, promises, and concealment of material facts.

23      More specifically, the defendant, together with his

24 codefendant, Jason Schiff, sought and obtained mortgage loans,

25 vehicle loans, lines of credit by making false statements

1    regarding their employment, financial statuses, the presence of

2    encumbrances on the collateral on property they pledged for

3    loans; and, further, that the defendant and his codefendant,

4    Jason, caused to be filed false releases of mortgages and liens

5    on real property and vehicles held for loans, thereby making it

6    appear that the title to the collateral was free and clear,

7    thereby allowing Yale and Jason Schiff to fraudulently obtain

8    additional proceeds or sell the loan proceeds -- or sell the

9    collateral and retain the sale proceeds without payment to the

10   lienholders.

11          As a part of this scheme, the evidence would show that

12   Yale Schiff and Jason Schiff fraudulently obtained a mortgage

13   and home equity lines of credit for a condominium located at

14   910 West Madison Avenue, Unit 802, in Chicago, Illinois.  And

15   as part of the scheme, the defendant fraudulently obtained or

16   assisted in fraudulently obtaining mortgage loans and home

17   equity lines of credit for additional residences located in

18   Chicago, including 1000 West Adams and 16 South Aberdeen.

19          With request -- with respect to the 910 Adams

20   property, in approximately 2005, Yale Schiff had an existing

21   mortgage on that property issued by Bank One.  The defendant

22   provided fictitious mortgage lien release documents to the Cook

23   County Recorder of Deeds that falsely represented that Bank One

24   had released its mortgage lien on the property when the

25   defendant knew that he had an unpaid loan balance and the lien

1   not been released.  This misrepresentation caused the recorder

2   to remove improperly the Bank One lien on the property.

3         In approximately October, the defendant arranged to

4   sell this Madison property to his brother and codefendant,

5   Jason Schiff.  Jason was then able to obtain a loan amount -- a

6   loan, a mortgage loan, in the amount of $375,200 from Chicago

7   Bancorp in order to purchase the property.  The loan was made

8   in part because the lien had been fraudulently released.  As a

9   result, the loan was funded and the defendant received

10  approximately $340,728 of the mortgage loan proceeds.

11        Thereafter, beginning in about October of 2009 and

12  continuing thereafter, Jason Schiff obtained additional loans

13  from Fifth Third Bank, which he pledged the Madison Street

14  property as collateral.  These lenders funded the additional

15  loans in part because Yale Schiff had fraudulently released the

16  Bank One lien and concealed this by -- concealed the existing

17  unpaid loan balance on the property.

18        As detailed in further detail in the plea agreement,

19  with respect to the Aberdeen property, in about July of 2005,

20  the defendant obtained a home equity line of credit in the

21  amount of 125,000 from Chicago Bancorp for a condominium

22  located at that address.  In obtaining it, he submitted income

23  documents, including false Forms W-2.

24        In August of 2005, he provided fictitious mortgage

25  lien release documents to the Cook County Recorder of Deeds

1    that falsely reported that this mortgage HELOC had been

2    released, and he did so at a time that he knew that he actually

3    had an outstanding unpaid balance and that the lien had not

4    been released by the lender.  These misrepresentations caused

5    the Recorder of Deeds to improperly remove the lien on the

6    property.

7          After obtaining the fraudulent release, the defendant

8    continued to make payments on the HELOC loan so that the lender

9    thought that -- had no reason to suspect that the lien had been

10   released.

11         Between July of 2005 and in December of 2005, the

12   defendant then obtained additional loans for this property from

13   multiple lenders, and he did so by making false representations

14   and filing false documents, which resulted in the fraudulent

15   release of these lenders' liens.

16         More specifically, in about July of 2005, he obtained

17   two loans from the property from Quicken Loans, one in the

18   amount of $480,000, which was subsequently assigned to IndyMac

19   Bank, and a second in the amount of $120,000, which was

20   subsequently assigned to Bank of America.  In obtaining these

21   loans, the defendant submitted false supporting income

22   documents, including false Forms W-2 and pay stubs.  At the

23   time of the closing, the defendant received about $93,000 from

24   the loan proceeds.

25         In about December of 2005, he obtained a home equity

1    line of credit for this property in the amount of 385,000 from

2    BMO Harris Bank.  In applying and obtaining the loan, the

3    defendant concealed the existence of the preexisting mortgage

4    loans issued on the property.  From about January of '06

5    through August of '07, he received approximately $383,000 in

6    advances from BMO Harris on that loan.

7           In approximately April of 2006, he provided fictitious

8    mortgage loan release documents to the Cook County Recorder of

9    Deeds.  And at the time he did that, he knew he actually had

10   unpaid loan balances and that the lien had not been released.

11   After obtaining this release, he continued to make payments on

12   the BMO Harris Bank HELOC loan.

13          In May of 2006, the defendant obtained $350,000 in a

14   cash-out refinance loan from Chicago Financial Services for the

15   Aberdeen property.  In applying for and obtaining the loan, he

16   concealed the existence of unpaid loans on the property,

17   including the prior mortgage loan and HELOC.  At the time of

18   the closing, he received approximately $348,000 in proceeds.

19          In September of 2006, the defendant provided

20   fictitious mortgage loan release documents to the Cook County

21   Recorder of Deeds for this mortgage loan at a time when he knew

22   that the loan actually had an unpaid loan balance and the lien

23   had not been authorized to be removed by the lender.

24          In December of 2006, he obtained a HELOC loan in the

25   amount of 468,000 from Washington Mutual Bank.  In applying for

1   the loan, he concealed the existence of the unpaid loans on

2   this property that were previously issued by other lenders.  In

3   support of the loan application, he submitted false Forms W-2

4   for tax years 2004 and 2005.

5           In November of 2007, the defendant provided fictitious

6   mortgage loan release documents to the Cook County Recorder of

7   Deeds, purporting to release the Washington Mutual Bank lien on

8   this property at a time when he knew he actually still had a

9   balance on the property and the lien shouldn't have been

10  released.  After obtaining the release, the defendant continued

11  to make payments to Washington Mutual.

12          In approximately August of 2008, he sold the Aberdeen

13  property to a third person for approximately $525,000, of which

14  he retained approximately 484,000 of the sales proceeds.  In

15  order to purchase the Aberdeen property from Yale Schiff, the

16  third party obtained a mortgage loan from Busey Bank and was

17  able to do so in part because of the fraudulent releases of the

18  prior loans concealed the existence of the outstanding

19  encumbrances on the property.

20          With respect to 1000 West Adams, in September of '06,

21  the defendant obtained a mortgage loan in the amount of 242,000

22  from Chicago Financial Services for a condominium located at

23  this address, Unit 816.  In November of 2006, this mortgage was

24  assigned to GMAC Bank.

25          In approximately December of 2007, he caused the

1    Recorder of Deeds in Cook County to receive a document which

2    reflected the release of the lien on this property.  The

3    defendant continued to pay monthly mortgage payments on this

4    property until approximately December of 2010, despite the

5    removal of the lien of Chicago Financial Services on this

6    property.

7            In April of '09, the defendant transferred title of

8    this property, which he held individually, to 1000 West Adams

9    LLC, an entity from which he and Individual A were the sole

10   members.  1000 West Adams LLC paid no funds or consideration

11   for this transfer.  In November of 2009, the defendant caused

12   this property to be conveyed for no consideration from

13   1000 West Adams LLC to Individual A as sole owner.

14           In approximately November of 2009, Individual A

15   obtained a mortgage from Wintrust Mortgage in the amount of

16   $188,250, using this property as collateral.  In order to

17   assist in obtaining the loan, the defendant fraudulently

18   concealed the existence of the outstanding debt owed to GMAC on

19   the property and falsely represented that the loan had --

20   mortgage loan had been paid in full and was closed as of

21   October 10th of 2007.  At the time he made these

22   representations, he knew the GMAC mortgage had not been paid

23   and that a balance remained.  This misrepresentation was

24   material to Wintrust in determining whether to approve the

25   mortgage for the subsequent purchaser.

1          In addition, between approximately 2008 and 2018, the

2     defendant, along with others, fraudulently obtained more than a

3     million dollars in vehicle loans from lending and financial

4     institutions through false statements.  That -- and these false

5     statements were later followed by efforts to remove the actual

6     lender's name from the title of some of those vehicles.  He

7     also received sale proceeds from the sale of vehicles -- some

8     of these vehicles in which he had fraudulently removed the

9     loans.

10         The evidence would further show that between

11    December 14 and July 18, the defendant used the identity of

12    another, fictitious identities of at least two individuals, and

13    false employment and information -- and income information to

14    obtain personal lines of credit in the names of these

15    individuals at institutions insured by the National Credit

16    Union Association and Federal Deposit Insurance Corporation.

17    Thereafter, the defendant obtained cash advances in the form of

18    lines of credit which he used for his personal benefit and for

19    the benefit of members of his family.

20         Between 2013 and 2015, the defendant opened bank

21    accounts at BMO Harris and FirstMerit Bank using a fictitious

22    Social Security number and a fictitious identity, and his use

23    of these accounts were loss -- resulted in losses to financial

24    institutions.

25         And, finally, between February of 2003 and July of

1    2018, the defendant and others used the identity of another,

2    fictitious identities, and false employment and income

3    information to open and use personal and business credit card

4    accounts at institutions insured by the National Credit Union

5    Association and Federal Deposit Insurance Association --

6    Federal Deposit Insurance Corporation.  Thereafter, he used

7    some of these credit cards to obtain cash advances, goods, and

8    services for his personal benefit, and in total, his conduct in

9    this regard caused losses to approximately ten different

10   financial institutions.

11             THE COURT:  Thank you, Mr. King.

12             MR. POULOS:  Your Honor, may I have a moment?

13             THE COURT:  Yes.

14        (Counsel and defendant conferring.)

15             MR. POULOS:  May I have a moment to confer with

16   Mr. King?

17             THE COURT:  Yes.

18        (Counsel conferring.)

19             MR. POULOS:  Your Honor, as part of Mr. King's

20   recitation of the facts, there's a reference to "Individual A"

21   in the written plea agreement.

22             THE COURT:  Yes.

23             MR. POULOS:  And I believe Mr. King inadvertently

24   identified Individual A by reference to particular family

25   title.

1       THE COURT:  Mm-hmm.

2       MR. POULOS:  I don't know if anybody picked up on

3  that.

4       Your Honor, we would ask that that reference be

5  stricken from the record in the event there's ever any

6  transcript of this proceeding.  There's no allegation that

7  Individual A engaged in any inappropriate conduct.

8       THE COURT:  Do you have any objection to that, just

9  referring to that person as "Individual A"?

10      MR. KING:  I don't think it changes the accuracy of

11  the facts, your Honor.

12      But as to the substitution of "Individual A," I don't

13  know that it matters materially to -- so if -- substituting

14  that in the record.

15      MR. POULOS:  Thank you, your Honor.

16      THE COURT:  Okay.  So instead of --

17      THE DEFENDANT:  There was two instances.

18      THE COURT:  Laura -- I heard it.

19      So instead of -- we'll strike the reference to the

20  family member, and we'll substitute in "Individual A."

21      MR. KING:  I believe the reference was ████████

22      THE COURT:  Yes, that's right.  So instead of that,

23  we'll substitute in "Individual A" because you were referring

24  to Individual A.  And it says "Individual A" in the plea

25  agreement.

1      MR. KING:  Correct, your Honor.

2      THE COURT:  Yes.

3      Are there other problems?

4      MR. POULOS:  No, your Honor.

5      THE DEFENDANT:  No, your Honor.

6      THE COURT:  Okay.

7      THE DEFENDANT:  Thank you.

8      THE COURT:  All right.  So, Mr. Schiff, you've heard

9  what the prosecutor said.  It was a long description of conduct

10  involving property and then cars and then credit cards.

11      Do you agree with what he said?

12      MR. POULOS:  Yes, your Honor.

13      THE COURT:  Okay.  So you admit the conduct regarding

14  the liens and the property.

15      THE DEFENDANT:  Yes, your Honor.

16      THE COURT:  Okay.  And then you admit the other

17  conduct involving cars and loans for cars and credit cards and

18  identities.

19      THE DEFENDANT:  Yes, your Honor.

20      THE COURT:  Okay.  So then how do you plead to

21  Count II, which is the bank fraud count?

22      THE DEFENDANT:  Guilty, your Honor.

23      THE COURT:  Okay.  All right.

24      So in light of that, I'm going to find in United

25  States v. Yale Schiff, which is 19 CR 474-1, that the defendant

1    is fully competent and capable of entering an informed plea,

2    that Mr. Schiff is aware of the nature of the charges and the

3    consequences of the plea, and that his plea of guilt is knowing

4    and voluntary and it's supported by an independent basis in

5    fact -- okay? -- that contains each element of the offense of

6    bank fraud.  All right?  So I'm going to accept the plea.

7           Now, Mr. Schiff, I'm sure your lawyers have told you

8    that I'm going to refer the case to probation.  And they'll

9    work with you; they'll work with your lawyers to prepare a

10   report.  It will be an extensive report.  And then you'll come

11   back for sentencing.

12          And, Dawn, what are we looking at?

13          THE CLERK:  I'm looking at August 15th.

14          MR. KING:  That should work.

15      (Counsel and defendant conferring.)

16          MR. POULOS:  Yeah, that's fine, your Honor.

17          THE COURT:  Okay.

18          THE CLERK:  11:00, Judge?

19          THE COURT:  Sounds good.

20          Is that a Thursday?

21          THE CLERK:  It's a Tuesday.

22          THE COURT:  Okay.  Great.  Thank you.

23          August 15th, 11:00.

24          MR. SHEPPARD:  Your Honor, may I -- I have a -- I

25   start a jury trial before Judge Coleman on August 14th.

1           THE COURT:  Is that a week?

2           MR. SHEPPARD:  The government has estimated ten days.

3           THE COURT:  Okay.

4           MR. POULOS:  A late August?  Couple weeks later?

5           THE COURT:  I might be doing college on the 15th.

6     So ...

7           MR. KING:  Is it possible to move it to the week

8     before, Judge?

9           THE COURT:  Well, I don't want to -- I just -- with

10    probation, you know, that's a date they kind of set, right?

11          THE CLERK:  84 days is August 10th, Judge.

12          MR. POULOS:  Your Honor, that week earlier I am

13    planning to take some time off.

14          THE COURT:  How about -- Dawn, how about the 25th or

15    the 24th?

16          MR. POULOS:  That works for me.

17          MR. SHEPPARD:  That should be fine with me as well.

18          THE COURT:  Are you here?

19          MR. KING:  I'm scheduled to be on trial that week, but

20    someone else can probably do the sentencing, if need be.

21          THE COURT:  Are you sure?  Do you want to go after

22    Labor Day?

23          MR. KING:  Yes, your Honor, that would be better.

24          THE COURT:  I could do August 7th.

25          MR. KING:  That would be fine, Judge.

1          THE COURT:  Okay.

2          MR. POULOS:  September 7th, your Honor?

3          THE COURT:  I mean September 7th.

4          MR. POULOS:  Thank you, Judge.  That's perfect.

5          MR. SHEPPARD:  Your Honor, I am due to leave town --

6   what time would the sentencing be set for on that day?

7          THE COURT:  Are you leaving town that day?

8          MR. SHEPPARD:  I am.  I haven't booked the flight.

9          THE COURT:  Let's do it at 9:00.  Let's do it at 9:00.

10  Then you can fly out that afternoon.

11         MR. SHEPPARD:  Okay.

12         THE COURT:  Okay?

13         MR. POULOS:  That will work.

14         THE COURT:  Okay.  Thanks, everybody.

15         MR. KING:  Thank you, your Honor.

16         MR. POULOS:  Thank you, your Honor.

17         THE CLERK:  Court stands in recess.

18      (Concluded at 11:45 a.m.)

19                  C E R T I F I C A T E

20      I certify that the foregoing is a correct transcript of the

21  record of proceedings in the above-entitled matter.

22

23  */s/ LAURA R. RENKE*                        *June 21, 2023*
    LAURA R. RENKE, CSR, RDR, CRR

24  Official Court Reporter

25