IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | 19 CR 474-2 |
| | ) | Judge Mary Rowland |
| JASON SCHIFF, | ) | |
| | ) | |
| Defendant. | ) | |

**JASON SCHIFF'S SENTENCING MEMORANDUM**

Defendant, Jason Schiff, by and through his counsel, Mina Zardkoohi, herein submits facts relevant to 18 U.S.C. §3553 and the Presentence Investigation Report ("PSR"). Mr. Schiff respectfully requests, pursuant to 18 U.S.C. §3553 and *United States v. Booker,* 125 S. Ct. 738 (2005) and its progeny, that this Court impose a sentence of probation. In support thereof, Mr. Schiff respectfully submits the following memorandum for the Court's consideration and contends that a sentence below the guideline range is supported by the factors set forth in 18 §U.S.C. 3553(a) as well as the Amendments to the Sentencing Guidelines that will go into effect on November 1, 2023. A sentence of probation, or in the alternative of house arrest, would be "sufficient but not greater than necessary" to achieve the statutory sentencing goals.

I. **Guideline Calculations and PSR Objections**

The PSR found the advisory guideline range to be 24 to 30 months, with the total offense level of 17 and criminal history category I (zero criminal points) under the current sentencing guidelines. However, because Mr. Schiff pled guilty to a misdemeanor and the

statutory maximum sentence is one year, his guideline range is twelve months. USSG §5G1.1(a). Mr. Schiff agrees with the final guideline range calculation of twelve months but contends that the initial guideline calculation of 24 to 30 months should be less to reflect both the upcoming changes in the guidelines as well as a minor role deduction.

Minor Role Reduction

Mr. Schiff should receive a two-point reduction for minor role pursuant to §3B1.2. The PSR did not recommend this reduction based on the Probation Officer's assessment that even though Jason Schiff's brother and co-defendant, Yale Schiff, had a stronger understanding of the loan acquisition and lien release process, Jason still "involved himself in the aforesaid fraudulent acts in such a way that detracts from any assertion that he did not possess an understanding of the scope and structure of the criminal conduct in which he involved himself" PSR at ¶29. The application of the minor role deduction does not depend on the lack of understanding of the scope and structure of the criminal conduct, although Jason certainly did not have a full grasp of the size of Yale's scheme. The scope of Yale's scheme is evidenced by the fact that Yale was indicted on fifteen counts, including numerous examples of identity fraud, of which twelve had nothing to do with Jason.

The fact that Jason was a straw purchaser does not exclude him from eligibility for the minor role. In *U.S. v. Leiskunas*, defendant Leiskunas, a participant in a major mortgage fraud scheme, was charged with committing wire fraud as a straw purchaser of seven properties. *U.S. v. Leiskunas*, 656 F.3d 732 (7th Cir. 2011). Leiskunas, very much like Jason here, acted only at the direction of others, did not know the true extent of the entire scheme and exercised no real power over the larger scheme. The Seventh Circuit ruled that playing a necessary role does not definitively prevent that same role from being minor, emphasizing

2

that in the cases where the drug couriers receive the benefit of the adjustment, they do so even though their role is necessary to the drug distribution. *Id*. at 739. Additionally, the court ruled that the fact that Leiskunas repeated the criminal act of straw-purchasing on more than one occasion does not necessarily preclude that defendant from receiving a minor role. *Id*. Clearly Leiskunas, having been a straw purchaser on seven occasions, had a sufficient understanding of "the scope and structure of the criminal conduct in which he involved himself," and yet that did not automatically exclude him from the minor role reduction.

     Jason does not argue that he should have received the four-level "minimal" participant reduction, which "is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2 cmt. n. 4. But rather a minor role. Minor and minimal roles are sometimes not distinguished properly and can be conflated. Sometimes defendants are denied minor role when really, they should be denied only minimal role. The minor participant determination requires the court to "weigh[ ] the totality of the circumstances" and is "heavily dependent on the facts of the particular case." *Id*. cmt. n. 3(C); see *United States v. Hill*, 563 F.3d 572, 577 (7th Cir.2009). A minor role adjustment is appropriate if the defendant is "substantially less culpable" than the average participant, but whose role could not be described as minimal. *United States v. Haynes,* 582 F.3d 686, 709 (7th Cir.2009). A minor player is substantially less culpable than the average participant, not the leaders. *United States v. Sorich,* 523 F.3d 702, 717 (7th Cir.2008). Jason should be compared not only to his brother but also to defendants in related cases who carried out this scheme with Yale and David Iszak (19cr582)[1] all of whom are average participants. Since there are no true leaders in this scheme as this is not an example of a

---

[1] Another of the participants in the loan washing scheme, Jeffrey Gross, died before he was indicted.

3

multi-layered criminal organization, Jason should be compared to Yale and David Iszak who are the average participants in the scheme. Compared to them, Jason was indeed less culpable if not least culpable.

### New Guidelines: Two-Point Reduction for Zero Criminal Points

On November 1, 2023, before Mr. Schiff's sentencing but after the submission of this memorandum, the Sentencing Commission will almost certainly adopt new guidelines which will affect the initial calculation of Mr. Schiff's guideline range as well as the sentencing recommendation.

The Commission created a new guideline §4C1.1 which would provide for a 2-point offense level reduction for certain "zero-point offenders."[2] (*See* April 27, 2023 Amendments to the Sentencing Guidelines, U.S. Sentencing Commission, p.87). Mr. Schiff is eligible to receive this reduction as he meets all the criteria.

With this guideline, as well as the minor role reduction, Mr. Schiff's initial guideline range would then be 12-18 months of imprisonment. Again, defendant concurs with the PSR assessment that due to the application of USSG §5G1.1(a), his final guideline range is capped at 12 months.

### New Sentencing Recommendation for Zone A and B

Equally important, as of November 2023, the Sentencing Commission will advise that a sentence other than a prison sentence is "generally appropriate" if a person is in Zone A or B and gets the §4C1.1 reduction or, regardless of the zone, if a defendant receives the §4C1.1 reduction. *Id.* at p. 80. The Commission reasoned that "zero-point offenders" were

---

[2] https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf

4

less likely to be rearrested than "one point" offenders, which was the largest variation of any comparison of offenders within the same criminal history category. *Id*. at p. 79.

Mr. Schiff would still be in Zone C, not A or B (see §5B1.1, comment n.2) because the bottom of his guideline range is twelve months. However, his case is somewhat of a less common occurrence in that both his minimum and maximum range is the same – namely twelve months. According to §5B1.1, comment n.2, if the minimum term of imprisonment in the guideline range is ten months or more, the guidelines do not authorize probation. However, Mr. Schiff finds himself just three months short of a cut-off point, in a guideline range that has 12 months as both a minimum and a maximum. For comparison, someone with offense level 11 would have a guideline range of 8 to 14 months and would be eligible for probation. This is somewhat of an arbitrary cut-off point, and coupled with the fact that the guidelines are only advisory and that Mr. Schiff plead guilty to a misdemeanor, the Court should disregard the comment n. 2 of §5B1.1 and sentence Mr. Schiff to probation.

II. **§3553(a) Factors as Applied to Defendant Mandate a Sentence Below the Guideline Range**

In *United States v. Booker*, the Supreme Court rendered the United States Sentencing Guidelines (USSG) advisory. 543 U.S. 220 (2005). However, the sentencing court is still required to follow the list of factors enumerated in § 3553(a). In *Rita v. United States*, the Court held that district court judges are required "to impose a sentence sufficient, but not greater than necessary, to comply with the basic aims of sentencing in § 3553(a)." 127 S.Ct. at 2469. After *Booker*, the district court should place "no limitation" on the information concerning the background, character, and conduct of a person convicted of an offense. *See* 18 U.S.C. § 3661; *Booker*, 125 S.Ct. at 760. There are several "individual characteristics . . .

5

not ordinarily considered under the Guidelines," but are still "matters that § 3553(a) authorizes the sentencing judge to consider." *Rita*, 127 S.Ct. at 2473 (Stevens, J., concurring). With these principles in mind, we turn to §3553 factors as they relate to Mr. Schiff.

    A.  Jason's personal history warrants a below-guideline sentence

Jason, who is currently 44 years old, grew up with his older brother Yale and their mother. His father was largely absent after the divorce from Jason's mother and Yale took over the role of the father figure to Jason. PSR at ¶53. Jason was an introvert, a more timid child, whereas Yale was his more assertive and outgoing brother. Jason idolized Yale and would look up to him. Id at ¶55. The two primarily lived with their mother, who although loving was also a very controlling woman with many mental health issues that went unaddressed. Although she took care and provided for Yale and Jason, she also created an unhealthy co-dependency with her sons. Id. at ¶51. For example, when Jason was young, she took them everywhere with her and Jason did not have much opportunity to play with friends as she was overprotective. Id. at ¶48.

As a young adult, Jason was a law-abiding and productive member of the society, having both graduated from high-school, obtained some college credits and maintained stable employment up until his brother involved him in his scheme. He worked for Hamakor, a Judaica store, for close to 18 years, starting as a sales employee and ending up as a store manager. Id. at ¶79. As for his criminal history, it is essentially non-existent. Aside from a few traffic tickets, he has no criminal history. Jason also did not have any violations while on pretrial release and tried to maintain employment throughout his pretrial release.

6

With Jason's lack of criminal history, educational and employment background, rehabilitation is not an issue here. This offense is an anomaly in Jason's behavior and stemmed from his inability to refuse and stop his own brother – actions as well as inactions which he deeply regrets. Therefore, specific deterrence is also not something that needs to be considered. The fact that Jason will be paying significant restitution for the rest of his life will be a form of punishment. But the punishment will also be the fact that this mistake has usurped his life both as far as his ability to find employment, obtain housing and pay off any judgments.

    B.  <u>The nature and circumstances of Jason's case justify a below-guideline sentence.</u>

Had it not been for Yale's abuse of his fraternal relationship with Jason, Jason would not be in this position today. *See* Probation Officer's Recommendation. p.2. That statement may not be true for many defendants, but it is undeniably true for Jason. The conflicting nature of a familial relationship in criminal law has been noted before. One of the upcoming amendments to the guidelines, for example, will be a two-point reduction for persons who have certain firearm straw-purchasing offenses, were motivated by a familial relationship and were otherwise unlikely to commit the crime. *See* April 27, 2023 Amendments to the Sentencing Guidelines, U.S. Sentencing Commission, p.65. Although this applies only to straw purchasers of firearms and not to the loan straw-purchasing of the type that Jason did, it is telling that the Commission acknowledged how influential familial relationships are. It is harder to refuse a persistent family member than an acquaintance, as the family member will use loyalty and familial love to persuade in a way that an acquaintance cannot. The Court should consider this upcoming reduction as a mitigating factor and draw parallels to this case.

Jason was influenced by his relationship with Yale and the unwavering admiration he had for him. Not only was Yale a father figure to Jason, but he also took care of Jason's as well as their mother's finances. Yale persuaded Jason to participate in a scheme in subtle and assiduous ways, never directly disclosing the end game and the extent of his schemes. Although Jason participated in Yale's scheme involving Madison property, the entire scope of Yale's scheme including every vehicle was unknown to Jason and to this date, the frequency with which Yale used Jason's identity goes beyond what Jason was aware of. Yale stole Jason's identity just like he stole the identity of several other people, and with it, he secured a number of loans, many of which, in particular certain car loans, Jason did not even know about. Yale went as far as forging Jason's signature on several occasions and filing applications in Jason's name. During his September 2020 proffer with the government, Yale admitted he had been solely in charge of the filing of the fraudulent releases and creating false documents, including forging notary public stamps. (See also PSR at ¶26, where the agent confirms there is no evidence that Jason participated in the production of the false documents and the filing of the fraudulent releases).

The PSR's assessment that Yale had a "stronger understanding" of the loans and releases is an understatement. Yale devised a very complex scheme with his partner David Iszak and implicated several family members and used their names, including Jason's, to apply for loans. And although Jason participated in some of the loans, he only had limited knowledge of it as Yale did not share details regarding the rest of his scheme and was very secretive. The entire scheme was devised, orchestrated, and perpetuated by Yale and it was not just a matter of a "stronger understanding" of loans and releases. For example, although Jason obtained the second HELOC loan on Madison property to benefit Yale, he had no

8

knowledge that Yale would go on to incur in excess of $250,000 on disbursements on that line of credit without ever informing Jason he would do so. In addition, Yale opened several bank accounts in Jason's name without Jason's knowledge and wrote dozens of checks in Jason's name from such accounts. See PSR at ¶36.

None of this is offered to excuse Jason's culpability but simply to illustrate the size of Yale's scheme and the extent to which Jason was not aware of all aspects of it. Jason deeply regrets getting involved in it and not putting a stop to it.

With no criminal history, significant employment and educational background, and the fact that the scheme was devised by his own brother who enticed him to get involved with supplications and false promises, Jason is certainly at a very low risk of recidivism.

### III.     Conclusion

Jason is respectfully asking for a sentence of probation or, in the alternative, of home arrest to reflect all the mitigating evidence and his low of risk of recidivism, which is "sufficient but not greater than necessary" to accomplish the sentencing goals.

> Respectfully submitted,
>
> /s/ Mina Zardkoohi
> Mina S. Zardkoohi
> Counsel for Jason Schiff

Mina Zardkoohi
900 W. Jackson Blvd, Suite 7E
Chicago, IL 60607

## CERTIFICATE OF SERVICE

      I, Mina S. Zardkoohi, an attorney, do hereby certify that I caused a copy of the foregoing motion to be served upon:

Patrick King
U.S. Attorney's Office, Fifth Floor
219 South Dearborn Street
Chicago, IL 60604

pursuant to Fed.R.Crim.P. 49, Fed.R.Civ.P. 5, L.R. 5.5, and the General Order on Electronic Case Filing of the United States District Court for the Northern District of Illinois, Eastern Division on October 23, 2023.

                                                   s/ Mina S. Zardkoohi
                                                   Mina S. Zardkoohi
                                                   900 W. Jackson Blvd,
                                                   Suite 7E
                                                   (708) 406-9889